**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

UNITED STATES OF AMERICA, *ex rel.*          Case No.: 8:16-CV-2076-T-27TBM
DONNA ISABELL and
KATHERINE SCHWALBE,

      Plaintiffs/Relators,

V.

KINDRED HEALTHCARE, INC., et al.,

      Defendants.
_____/

## SECOND AMENDED COMPLAINT

Relator/Plaintiff DONNA ISABELL and Relator/Plaintiff KATHERINE SCHWALBE ("Relators"), by and through undersigned counsel, bring this False Claims Act Complaint, on behalf of the UNITED STATES OF AMERICA, against Defendants KINDRED HEALTHCARE, INC., d/b/a KINDRED AT HOME, GENTIVA HEALTH SERVICES, INC., KINDRED SYSTEMS, INC., GENTIVA HEALTH SERVICES (CERTIFIED). INC., SENIOR HOME CARE, INC., CHRIS GELVIN, M.D., P.A.

I. JURISDICTION AND VENUE ............................................................................. 1

II. PROCEDURAL HISTORY ................................................................................ 1

III. THE PARTIES ................................................................................................. 2
   A. PLAINTIFFS/RELATORS ............................................................................... 2
     1. Donna Isabell ..................................................................................... 3
     2. Katherine Schwalbe ........................................................................... 3
   B. THE DEFENDANTS ...................................................................................... 3
     1. Kindred Healthcare, Inc., d/b/a/ Kindred at Home ............................ 3
     2. Gentiva Health Services, Inc. ............................................................ 4
     3. Senior Home Care, Inc. ..................................................................... 4
     4. Kindred Systems, Inc. ........................................................................ 4
     5. Gentiva Health Services (Certified), Inc. ......................................... 4
     6. Chris Gelvin, M.D. ............................................................................ 4

IV. BACKGROUND ON FEDERAL AND STATE HEALTH INSURANCE
PROGRAMS ..................................................................................................... 5
   A. MEDICARE PROGRAM .................................................................................. 5
     1. Background and Requirements ........................................................... 5
     2. Medicare Coverage for Home Health Care Services ........................ 6
     3. Payment to Home Health Providers and Physicians ........................ 7
   B. MEDICAID PROGRAM ................................................................................. 8

V. APPLICABLE LAW ......................................................................................... 9
   A. THE FEDERAL FALSE CLAIMS ACT ............................................................ 9
   B. THE FEDERAL ANTI-KICKBACK STATUTE ................................................ 10
   C. STARK LAW ............................................................................................ 12

VI. FRAUD ALLEGATIONS BY RELATORS ................................................ 13
   A. BILLING SCHEMES .................................................................................. 13
     1. Patients Not Homebound .................................................................. 13
     2. Excessive Recertifications ............................................................... 15
     3. Double Billing Diabetic Patients ..................................................... 17
     4. Missing Visits To Increase Revenue ................................................ 18
     5. Discharging and Billing Using the "RN-66" Form ......................... 19
   B. FRAUDULENT DOCUMENT SCHEMES ........................................................ 20
     1. Claims Made Without Recertification Orders ................................. 22
     2. Claims Made Without Required Face-to-Face Visits ...................... 23
   C. KICKBACK SCHEMES ............................................................................... 24
     1. Dr. Kurtis Biggs ............................................................................... 24
     2. Dr. Chris Gelvin ............................................................................... 25
     3. Paying Above FMV to Induce Referrals ......................................... 26
   D. UNDERSTAFFING ..................................................................................... 27

VII. RETALIATION ............................................................................................. 29
   A. RETALIATION AGAINST RELATOR DONNA ISABELL ............................... 29
   B. RETALIATION AGAINST RELATOR SCHWALBE ....................................... 33

# I.    JURISDICTION AND VENUE

1.    This action arises under the laws of the United States of America to redress violations of the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*

2.    Subject-matter jurisdiction is conferred by 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345.

3.    Venue is proper in this district pursuant to 28 U.S.C. §3732(a) and 28 U.S.C. §§1391(b)(1) and (2).

# II.    PROCEDURAL HISTORY

4.    On March 11, 2016, Relators filed their Original Complaint, under seal, attaching seven (7) exhibits, alleging that Defendants submitted or caused the submission of false claims to federal and state health programs, in violation of the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* and analogous state false claims acts.

5.    On May 15, 2016, Relators filed, under seal, their First Amended Complaint.

6.    On March 30, 2018, the government filed a notice indicating that it was "not intervening at this time," because it had "not been able to complete its investigation sufficiently to make an informed decision whether to proceed with the action." However, the government expressly reserved its right to intervene at a later date, noting that the government "will continue its investigation." *See* Docket No. 36.

7.    The government's March 30th notice also requested that the Amended Complaint be unsealed:

> Finally, the Government requests that only the relator's Complaint, this Notice, and the attached proposed Order be unseal. The United

States requests that all other papers on file in this action remain under seal….

8. The proposed order attached to the Government's Notice says, in pertinent part:

> it is hereby ORDERED:
> 1.     The complaint be unsealed and served upon the defendants by the relator.
> 2.     All other contents of the Court's file in this action shall remain under seal and not be made public ….

9. On May 1, 2018, the Defendants Kindred Healthcare, Inc., d/b/a Kindred at Home, Gentiva Health Services, Inc., Kindred Systems, Inc., Gentiva Health Services (Certified) Inc., and Senior Home Care, Inc., (the "Kindred Defendants") filed a motion to dismiss the Amended Complaint, essentially alleging a failure to plead False Claims Act claims with the requisite specificity.

10. On May 22, 2018, Relators filed a response to the motion to dismiss.

11. On July 20, 2018, before the Court ruled on the motion to dismiss, Relators filed a Motion for Leave to File a Second Amended Complaint.

12. No defendants have, as of yet, been served with the Amended Complaint.

13. This Second Amended Complaint is being filed pursuant to the Court's Order granting Relators leave to file an amended pleading.

## III.     THE PARTIES

### A.     Plaintiffs/Relators

14. Relators Donna Isabell and Katherine Schwalbe are residents of Florida and citizens of the United States.

### 1. Donna Isabell

15. Relator Donna Isabell is a resident of Hillsborough County, Florida. For a period of 2 years and 5 months, Ms. Isabell served as the Area Vice President for Defendant Kindred Healthcare.

### 2. Katherine Schwalbe

16. Relator Katherine Schwalbe is a resident of Lee County, Florida. For a period of 10 years and 10 months, Ms. Schwalbe served as an Account Manager for Defendant Senior Home Care.

### B. The Defendants

### 1. Kindred Healthcare, Inc., d/b/a/ Kindred at Home[1]

17. Defendant Kindred Healthcare, Inc. is a corporation organized under the laws of the state of Delaware in 1998 with its principal place of business located at 680 South Fourth Street Louisville, Kentucky, 40202. Kindred Healthcare, Inc. operates four divisions: Transitional Care Hospitals, Nursing and Rehabilitation Centers, Care Management, and Kindred Rehabilitation Services. The Care Management Division of Kindred Healthcare, Inc. includes Kindred at Home. Kindred at Home provides home health care services and skilled rehabilitation services including physical, occupational and speech therapy to patients at home, skilled nursing facilities and assisted and independent living facilities around the county.

---

[1] Kindred Healthcare, Inc. is now responsible for the conduct of the Kindred Defendants through acquisition or merger. As a result, throughout this complaint, conduct of the defendant entities will be attributed to "Kindred" as the entity now responsible for conduct of its divisions and subsidiaries.

### 2.    Gentiva Health Services, Inc.

18.    Defendant Gentiva Health Services, Inc. is a provider of home health care, hospice, and community care services headquartered in Atlanta, Georgia. On or about February 2, 2015, Kindred Healthcare, Inc. acquired Gentiva Health Services, Inc., with Gentiva Health Services, Inc. continuing as a wholly owned subsidiary of Kindred Healthcare, Inc.

### 3.    Senior Home Care, Inc.

19.    Defendant Senior Home Care, Inc. is a Florida corporation that provides home health care in Florida and Louisiana. On or about November 4, 2013, Kindred Healthcare, Inc. acquired Senior Home Care, Inc.

### 4.    Kindred Systems, Inc.

20.    Defendant Kindred Systems, Inc. is a corporation organized under the laws of the state of Delaware whose principal place of business is located at 680 South Fourth Street, Louisville, Kentucky, 40202. Kindred Systems, Inc. is a subsidiary of Kindred Healthcare, Inc.

### 5.    Gentiva Health Services (Certified), Inc.

21.    Defendant Gentiva Health Services (Certified), Inc. is a corporation organized under the laws of the state of Delaware whose principal place of business is located at 680 South Fourth Street, Louisville, Kentucky, 40202. Gentiva Health Services (Certified), Inc. operates as a subsidiary of Gentiva Health Services, Inc.

### 6.    Chris Gelvin, M.D.

22.    Defendant Chris Gelvin, M.D. is a physician who practices internal medicine in Sarasota County, Florida. Dr. Gelvin is the owner of Chris R. Gelvin, M.D., P.A. located

at 1217 East Ave., Suite 301, Sarasota, Florida, 34239. According to the Florida Secretary of State, Dr. Gelvin has been in practice since 1999.

## IV.    BACKGROUND ON FEDERAL AND STATE HEALTH INSURANCE PROGRAMS

### A.    Medicare Program

#### 1.    Background and Requirements

23.    In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare program to provide health insurance for the elderly and disabled. 42 U.S.C. §§1395 *et seq*.  Medicare is a health insurance program for: people aged 65 or older; people under the age of 65 with certain disabilities; and people of all ages with end-stage renal disease. Medicare has four primary parts: Part A- hospital insurance; Part B- medical insurance; Part C- Medicare advantage managed care; and Part D- prescription drugs.

24.    Medicare Part A helps cover inpatient care in hospitals. Medicare Part A also helps cover nursing care, some home health services, skilled nursing care after a hospital stay and hospice care.  Medicare Part B helps cover doctors' services and outpatient care. Medicare Part B also helps cover some home health care and supplies.

25.    The Medicare Program is a federally funded and operated program.  Medicare is administered by the United States Department of Health and Human Services (HHS) through the Centers for Medicare and Medicaid Services (CMS), a department of HHS. Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government.

26.    To participate in Medicare, providers must certify that their services are provided economically and only when, and to the extent they are, medically necessary. As a

condition for Medicare payment, a physician must certify the necessity of the services, and, in some cases, recertify the continued need for those services. 42 C.F.R. §424.10.

2.     **Medicare Coverage for Home Health Care Services**

27.    Medicare pays for certain non-physician skilled services in the home when a physician certifies that the patient is in need of such skilled care and that the patient is "confined to the home" within a statutory definition of that term.

28.    These non-physician home health services include skilled nursing care, physical therapy, speech pathology services, and in certain instances, occupational therapy. 42 C.F.R. §409.42(c)(4). Entities referred to as "home health providers" provide these services in the patient's home. Both Medicare Part A and Medicare Part B provide payment for such services. 42 U.S.C. § 1395f(a)(2)(C); 42 U.S.C. § 1395n(a)(2)(A).

29.    In order for Medicare to pay for such home health services, a physician independent of the home health provider must certify that the patient is "confined to the home." 42 U.S.C. § 1395f(a)(2)(C); 42 U.S.C. § 1395n(a)(2)(A). A patient is "confined to the home" only if:

> (a) The individual "has a condition, due to an illness or injury, that restricts the ability of the individual to leave his or her home except with the assistance of another individual or the aid of a supportive device (such as crutches, a cane, a wheelchair, or a walker)" or
>
> (b) The individual "has a condition such that leaving his or her home is medically contraindicated."

42 U.S.C. § 1395f(a); 42 U.S.C. § 1395n(a)(2). While an individual does not have to be bedridden in order to be considered "confined to his home," the condition of the patient should be such that there exists an inability to leave the home, and that leaving the home would require considered and taxing effort by the patient. 42 U.S.C. §1395f(a)(8).

30. The certifying physician together with the home health provider must also establish a plan of care for the patient. This plan of care is to be periodically reviewed by the physician. *See* 42 U.S.C. §§1395d(a)(3), 1395k(a)(2)(A), 1395x(m), 42 C.F.R. §§424.22, 409.41, 409.42. In order for the patient to continue to receive home health care in the home for a period extending beyond sixty days, the physician must re-certify that the patient is confined to his home and must also re-certify a plan of care for that patient. 42 C.F.R. §§409.42(3), 424.22(b).

### 3.       Payment to Home Health Providers and Physicians

31. Medicare does not contract in advance with home health providers to provide particular services for particular patients. Instead, Medicare reimburses providers for services provided. Medicare pays home health providers under the Home Health Prospective Payment System.

32. Payments under the Home Health Prospective Payment System are based upon sixty-day "episodes" of care. The Home Health Prospective Payment System rate is intended to reimburse the home health care agency for all reasonable and necessary nursing and therapy services, routine and non-routine medical supplies, home health aide services, and medical social services associated with the care of an individual patient during that sixty-day episode. The payment amount for each sixty-day episode of care, as well as the

number of visits, are adjusted to account for the patient's health condition, clinical characteristics, and service needs as described by the physician and the home health agency.

33. Both home health providers and physicians sign certifications as a condition of being permitted to bill Medicare and receive any payment. Only individuals and entities which have signed the required certifications concerning compliance with the requirements of the Medicare program, and are thereafter approved for participation, are assigned billing numbers and permitted to bill Medicare. These billing numbers are known as "Provider Identification Numbers," "CMS Certification Numbers" or "OSCAR numbers."

34. When an individual or entity renders a service, a claim for reimbursement is submitted that includes the individual or entity's billing number, the identification number for the patient (known as a "HICN"), and a code for the service rendered.

35. Individuals and entities may submit claims to Medicare only for services they actually rendered that were medically necessary. Individuals and entities submitting claims must also maintain medical records showing that services were rendered and that the service was medically justified.

### B.    Medicaid Program

36. Medicaid was created in 1965 to aid states in furnishing medical assistance to eligible persons. Medicaid is a joint federal and state assistance program. Each state administers its own Medicaid program. Funding for Medicaid is shared between the federal government and the state governments that choose to participate in the program.

37.   Federal support for Medicaid is significant. Each state's federal funding is determined by its Federal Medical Assistance Percentage (FMAP), which is set annually and is based on per capita income compared to the national average.

38.   Similar to Medicare, a claim under the Medicaid program is reimbursable only when it is reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.  42 C.F.R. §402.3.

## V.   APPLICABLE LAW

### A.   The Federal False Claims Act

39.   The federal False Claims Act provides that any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspires to commit a violation of (1) or (2) is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. §3729(a)(1)(A),(B) and (C).

40.   The terms "knowing" and "knowingly" under this section mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required. 31 U.S.C. §3729(b)(1).

### B.    The Federal Anti-Kickback Statute

41.   The federal Anti-Kickback statute was enacted in 1972 to protect patients and federal health care programs from fraud and abuse by controlling the influence of money on health care decisions.

42.   The federal Anti-Kickback Statute and analogous state laws make it a crime to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce a person (1) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or (2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program. 42 U.S.C. § 1320a-7b(b)(1) and (2).

43.   The term "any remuneration means any kickback, bribe, or rebate, direct or indirect, over or covert, in cash or in kind. 42 U.S.C. § 1320a-7b(b)(1)

44.   Violations of the federal Anti-Kickback Statute must be knowing and willful. 42 U.S.C. § 1320a-7b(b)(1).

45.   A violation of the federal Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, five years imprisonment, or both. Any party convicted under the statute must be excluded from Federal health care programs for a term of at least five years.  42 U.S.C. §1320a-7(a)(1).

46.   HHS provides safe harbor regulations that define practices that are not subject to prosecution or sanctions under the federal Anti-Kickback Statute because such practices would unlikely result in fraud or abuse. Only those arrangements that meet all of the conditions set forth in the safe harbor exception are afforded such safe harbor protection.

None of the practices at issue in this case meet these safe harbor conditions. *See* 42 C.F.R. § 1001.952.

47. As a prerequisite to participating in federally-funded health care programs, providers must certify their compliance with the federal Anti-Kickback Statute.

48. Compliance with the Anti-Kickback Statute is a condition of payment under the Medicare program. Even in the absence of an express certification of compliance, a party that submits a claim for payment impliedly certifies compliance with all conditions of payment.

49. The Anti-Kickback statute prohibits the payment of remuneration by a home health care company to a physician that has, as one of its purposes, inducement of the physician's referrals of individuals to the home health care company or inducement of certifications by the physician that individuals have a need for home health services. The Anti-Kickback statute also prohibits the payment of remuneration by a home health care company to a recruiter who has, as one of its purposes, the arrangement for the provision of Medicare services including home health.

50. The Anti-Kickback Statute expressly provides that claims that arise from a kickback scheme are false and violate the False Claims Act. Any person who accepts such payments and thereafter refers or certifies patients for home health has caused the submission of false claims to the United States within the meaning of the False Claims Act.

### C.    <u>Stark Law</u>

51.    The Stark Law prohibits home health providers from submitting Medicare claims that are the product of patient referrals from physicians with whom a home health agency has an impermissible financial relationship. 42 U.S.C. §1395nn.

52.    A physician who certifies a patient for home health and establishes a plan of care has referred the patient for home health care within the definitions of the statute. 42 U.S.C. §1395nn (h)(5)(B).

53.    A financial relationship that is impermissible is defined as a "compensation arrangement." 42 U.S.C. §l 395nn(a)(l) and (2).

54.    A "compensation arrangement" is defined as "any arrangement involving any remuneration between a physician ... and an entity." 42 U.S.C. §1395nn(h)(l)(A).

55.    If an impermissible financial relationship exists, then "(A) the physician may not make a referral to the entity for the furnishing of designated health services ... and (B) the entity may not present or cause to be presented a claim ... for designated health services furnished pursuant to a referral prohibited under subparagraph (A)." 42 U.S.C. §1395nn(a)(l).

56.    The Stark Law requires that the Medicare program deny payment for claims for any services billed in violation of its provisions. 42 U.S.C. §1395nn(g). In addition, it requires that providers who have collected Medicare payments for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. §411.353.

57.  Compliance with the Stark Law is a condition of payment under the Medicare program. Even in absence of an express certification of compliance, a party that submits a claim for payment impliedly certifies compliance with all conditions of payment.

58.  Claims that arise from violations of the Stark Law are false and violate the False Claims Act.

## VI.  FRAUD ALLEGATIONS BY RELATORS

### A.  Billing Schemes

59.  Kindred knowingly and fraudulently submitted false claims to the government by seeking reimbursements for services provided to patients which were excessive, unrelated to patient needs, and purposefully designed to maximize reimbursements from Medicare in order to boost corporate revenue.

#### 1.  Patients Not Homebound

60.  Kindred knowingly submitted false claims to the government by seeking reimbursement from Medicare for home health services that were not permitted because patients were not homebound.

61.  In order to bill Medicare for home health services, a patient must be considered "homebound" as defined by Medicare.  If a patient is not truly homebound, then home health services are not medically necessary and therefore not appropriate for Medicare reimbursement.

62.  Kindred knowingly submitted numerous false claims for payment for patients who had no restrictions of mobility and were not homebound, including a patient identified herein as "Patient W."

63.  The false claims included submissions of claims for Medicare reimbursement for home health services fraudulently provided to Patient W despite the patient not being homebound for all periods of service.

64.  Patient W was referred by the Shell Point Nursing Pavilion on or about September 10, 2014, and admitted to the Kindred Ft. Myers home health location as a new admission on or about September 11, 2014.

65.  Kindred falsely certified Patient W as homebound.

66.  In an internal Kindred email dated October 16, 2014, Patient W was reported to be volunteering for 4 hours a day twice a week at a gift shop.

67.  Patient W was also reported to be volunteering for a few hours at a thrift store.

68.  Patient W reportedly would play bridge and mahjong twice a week outside of her home.

69.  Patient W admitted to Kindred personnel that she drove herself to her volunteering commitments as well as her social events. (Exhibit A).

70.  Kindred knowingly submitted numerous false claims to Medicare for payment for Patient W despite Patient W not being homebound for all periods of service.

71.  Patient W was a patient whose care was reimbursed through the Medicare program.

72.  Kindred utilized the same methods and means set forth in paragraphs 60- 71 above for other patients over the period from 2012 through at least 2015.

73.  Kindred submitted false claims for patients not actually homebound in order to continue a billing scheme to increase revenue.

## 2.    <u>Excessive Recertifications</u>

74.    Kindred knowingly submitted false claims to the government by seeking reimbursement from Medicare for home health services that were not permitted because patients were fraudulently recertified as homebound, including a patient identified herein as "Patient X" and a patient identified herein as "Patient Y." In many instances, patients continued to be fraudulently recertified for home care for over three years.

75.    Kindred knowingly participated in this billing scheme in order to increase revenue.

76.    The false claims included submissions of claims for Medicare reimbursement for services fraudulently provided to Patient X.

77.    Patient X began care on September 22, 2012, and service continued through February 26, 2015.

78.    Patient X was discharged and readmitted several times over this period.

79.    Kindred's medical records (copies of which have been provided to the Government pursuant to the mandated Disclosure in this case) offer no evidence to indicate why Patient X needed to be on service that long and provide no support to substantiate that length of care.

80.    Patient X was a patient whose care was reimbursed through the Medicare program.

81.    The false claims included submissions of claims for Medicare reimbursement for services fraudulently provided to Patient Y.

82.    Patient Y was diagnosed with depression and anxiety.

83.    Patient Y began care on July 11, 2011 and service continued through December 14, 2014.

84.    Over a period of approximately 3 years, Patient Y was recertified several times, discharged and then repeatedly readmitted with therapy added sporadically.

85.    Kindred's medical records (copies of which have been provided to the Government pursuant to the mandated Disclosure in this case) offer no evidence to indicate why Patient Y needed to be on service that long and provide no support to substantiate that length of care.

86.    Patient Y was a patient whose care was reimbursed through the Medicare program.

87.    Kindred knowingly submitted false claims to the government by seeking reimbursement from Medicare for home health services that were not permitted because Patient X and Patient Y were fraudulently recertified as homebound.

88.    Kindred exerted corporate pressure to keep the rate of recertification of patients above a certain percentage, including through Kindred employees Jason Owen and Lisa Ramstack.

89.    This pressure came in the form of emails, phone calls, meetings, quarterly reviews and bonus structure.

90.    Exhibit B contains examples of the pressure exerted by Kindred to recertify: an email to Relator Isabell congratulating her on meeting her recertification goal as well as an email from Sarah Feldman discussing monthly recertification numbers where she comments "Loving those recerts!" (Exhibit B).

91.    Kindred utilized the same methods and means set forth in paragraphs 74- 87 above for other patients over the period from 2012 through at least 2015.

92. Kindred fraudulently recertified patients in order to continue a billing scheme to increase revenue.

93. Kindred's recertifications were often not based on medical need. Instead, Kindred pushed employees to process recertifications on patients that no longer needed home care in order to meet its recertification goals.

94. Kindred recertified multiple patients for wound care when they in fact no longer had wounds justifying such recertifications.

95. Kindred recertified multiple patients for physical therapy for over two years when there was no need for such recertification in order to meet its recertification percentage goals.

### 3.   Double Billing Diabetic Patients

96. Kindred knowingly submitted numerous false claims for diabetic patients for home health services fraudulently provided in the Lamplight facility in Sarasota, Florida.

97. Home health patients would be referred and admitted to the Lamplight Assisted Living Facility (ALF) in order for Kindred to bill the patient at a higher level of care.

98. Diabetic management services were already available to residents of Lamplight ALF for a fee that was included in their monthly rental payment.

99. Kindred home health nurses gave insulin injections to these patients, many of whom could self-inject without the assistance of a home health nurse, and subsequently billed Medicare. Lamplight ALF simultaneously billed Medicaid for the same service, unnecessarily duplicating billings.

100. Kindred utilized the same methods and means set forth in paragraphs 96- 99 above for other patients over the period from 2012 through at least 2015.

101. Kindred knowingly participated in this billing scheme and submitted numerous false claims to the government in an effort to boost corporate revenue.

### 4.     Missing Visits To Increase Revenue

102. Kindred knowingly submitted false claims to the government by seeking reimbursement from Medicare for home health services that were part of a scheme to increase corporate revenue by reducing the number of physician-ordered visits.

103. Medicare payments to home health providers are based upon sixty-day "episodes" of care. In order for a home health care agency to be reimbursed in full for the episode, a minimum of five visits must be completed.

104. Supervisory Directors of Kindred told Amy Montgomery, a former Branch Director for Kindred at Home, to make patients "miss" visits in order to increase revenue.

105. If a patient missed a visit, Kindred did not have to pay their staff for the visit, but would still seek to be reimbursed by Medicare for the episode.

106. Kindred knowingly submitted false claims to the government by seeking reimbursement from Medicare for missed visits it helped create.

107. Kindred utilized the same methods and means set forth in paragraphs 102- 106 above over the period from 2012 through at least 2015.

108. Kindred knowingly participated in this scheme to reduce visits and increase profits, and submitted numerous false claims to the government as part of this scheme.

### 5.  Discharging and Billing Using the "RN-66" Form

109.  Kindred knowingly submitted false claims to the government by seeking reimbursement from Medicare for home health services that were part of a scheme to increase corporate revenue by discharging patients without visits being made and then billing for services.

110.  Homecare Homebase is a cloud-based home health software that offers computer programs to assist with scheduling, routing, patient notes, intake, approvals, billing and payment.

111.  Homecare Homebase software is used at Kindred facilities.

112.  "RN66" is a code used in Homecare Homebase software.

113.  "RN66" is a code used for patients that are discharged without a physical visit at the time of discharge.

114.  Kindred held case conference meetings in the Fort Myers office every Wednesday morning.

115.  All clinical staff, account managers from the marketing department, and office staff attended these weekly case conference meetings.

116.  During weekly case conference meetings, Kindred clinical staff, account managers and office staff discussed upcoming patient recertifications, complex patients, discharges, and upcoming discharges.

117.  Kindred company updates and any changes within Kindred or changes with Medicare were also discussed during weekly case conference meetings.

118. During case conference meetings, Kindred clinical staff members were often unable to report on patients, including when the last visit was made.

119. Many patients in Fort Myers were coded with RN66 because Kindred never followed up on these patients nor made the appropriate visits in Fort Myers.

120. Kindred added these patients to the "RN66" list, which meant discharge them and bill. Exhibit C contains an email concerning billing for a patient who was discharged and billed using the RN-66 form when sufficient care had not been provided.

121. The patient referenced in Exhibit C was discharged as "RN 66" without a visit being made.

122. Once the "RN66" coding was completed, Kindred billed for services. (Exhibit C).

123. Kindred utilized the same methods and means set forth in paragraphs 109- 122 above for other patients over the period from 2012 through at least 2015.

124. Kindred knowingly participated in this scheme to increase profits and submitted numerous false claims to the government as part of this scheme.

**B.     Fraudulent Document Schemes**

125. Kindred knowingly and fraudulently submitted false claims to the government by seeking reimbursements for services where the required documentation was completed and compiled in a fraudulent manner and purposefully designed to maximize reimbursements from Medicare in order to boost corporate revenue.

126. Kindred's billing department reviewed referrals in order to verify the patient was eligible and enrolled in the Medicare program.

127.  Once Medicare enrollment was verified, an employee from Kindred's billing department would generate an electronic chart as well as a paper chart for the patient and send the charts to the clinical department.

128.  An employee from Kindred's clinical department would then call the patient to discuss the referral, arrange a visit with a Kindred employee, and schedule a date for a nurse to admit the patient to home health care services, which was to be paid by Medicare.

129.  In order to fully bill a claim to Medicare, including initial requests for payment as well as final end-of-episodes claims, Kindred was required to have the following documentation:

> (1) A signed physician's referral ordering home health care;
>
> (2) A CMS Form 485 outlining the plan of care, signed by the physician and the registered physical therapist;
>
> (3) An OASIS evaluation signed by the patient and a registered nurse and/or a registered physical therapist; and
>
> (4) "Revisit Forms" documenting the date of each home visit and specifying the services provided, signed by both the patient and the registered nurse or the physical therapist performing the visit.

130.  In numerous instances, and as a regular practice, some or all of this documentation was completed and compiled in a false and fraudulent manner, through one or more of the following methods.

## 1.     Claims Made Without Recertification Orders

131.  Kindred knowingly and fraudulently submitted false claims to Medicare for payment by recertifying patients without recertification orders.

132.  Kindred submitted false claims to Medicare stating that they received an order from the physician to recertify a patient when there were in fact no orders and no signatures from the physicians for these services.

133.  Exhibit D shows an Order Tracking Report listing instances where physicians had not signed or otherwise ordered the services. (Exhibit D).

134.  Some locations, including Fort Myers, Melbourne, and Miami treated patients before receiving a doctor's signed recertification order.

135.  Kindred submitted claims to Medicare before the orders were signed.

136.  Kindred knowingly recertified patients for home health care when no doctor had given such an order.

137.  Several doctors at Kindred's Shell Point, Sarasota, and North Point facilities, including C.D. and M.C., complained about recertification orders being delivered after the fact or simply refused to sign the orders altogether.

138.  When a facility's doctor or a patient's doctor refused to sign orders, Kindred would either process an order without obtaining a physician signature to receive payment, or request the facility's medical director to sign the order.

139.  Kindred utilized the same methods and means set forth in paragraphs 131- 138 above for patients over the period from 2012 through at least 2015.

140.  Kindred knowingly participated in this fraudulent document scheme and submitted numerous false claims to the government in an effort to boost corporate revenue.

### 2.       Claims Made Without Required Face-to-Face Visits

141.  Kindred knowingly and fraudulently submitted false claims to Medicare for payments for referrals without completing the required face-to-face visit.

142.  The Affordable Care Act (ACA) established a face-to-face encounter requirement for certification of eligibility for Medicare home health services, by requiring the certifying physician to document that he or she, or a non-physician practitioner working with the physician, had seen the patient. The encounter must have occurred within the 90 days prior to the start of care, or within the 30 days after the start of care. Exhibit E shows a Home Health Face-to-Face tracking report showing multiple instances where face-to-face visits were not completed, as shown in the entries for the column titled "F2F Status" on Exhibit E. (Exhibit E).

143.  Kindred knowingly submitted false claims to the government by seeking reimbursement from Medicare for home health services that were not permitted because the required face-to-face visit was never completed.

144.  Kindred utilized the same methods and means set forth in paragraphs 141- 143 above for patients over the period from 2012 through at least 2015.

145.  Kindred knowingly participated in this fraudulent document scheme and submitted numerous false claims to the government in an effort to boost corporate revenue.

### C.     Kickback Schemes

146. Kindred knowingly participated in a variety of kickback schemes in violation of the Stark Law and the Anti-Kickback Statute in order to gain referrals and boost corporate revenue.

#### 1.     Dr. Kurtis Biggs

147. Kindred recruited Dr. Kurtis Biggs for a medical director position in the Naples office in an effort to gain referrals.

148. Kindred already employed Dr. Quinetero as medical director in the Naples office.

149. Kindred unsuccessfully attempted to retain two medical directors for one office simultaneously.

150. Unable to hire a second medical director, Kindred looked for another way to ensure referrals from Dr. Biggs.

151. Dr. Biggs conveyed that he would refer patients to Kindred if a colleague, Sebastian Caltabiano, were hired as an accounts manager.

152. Dr. Biggs requested that Caltabiano handle all of his referrals and subsequently receive the bonuses from such referrals. Exhibit F shows email communications explaining the process of hiring medical directors, the business and potential referrals from Dr. Biggs, and the hiring of Sebastian Caltabiano. (Exhibit F).

153. Kindred and Dr. Biggs had a financial relationship as defined by Stark.

154. Dr. Biggs referred patients to Kindred.

155. One of the purposes of Kindred's compensation to Dr. Biggs was to induce referrals.

156. The financial relationship between Kindred and Dr. Biggs did not qualify for an exception to Stark's prohibition on referrals.

157. Kindred's relationship with Dr. Biggs violated the Stark Law and the Anti-Kickback Statute.

## 2. **Dr. Chris Gelvin**

158. Kindred knowingly participated in a kickback scheme with Defendant Chris Gelvin in order to gain referrals and boost profit.

159. The Centers for Medicare and Medicaid Services (CMS) requires facilities designate a physician to serve as medical director. CMS guidelines specify that the medical director is responsible for implementing resident care policies and the coordination of medical care in the facility.

160. Dr. Gelvin was hired as the medical director in Kindred's Sarasota office.

161. Kindred promised Dr. Gelvin $25,000/year for his medical director position to be paid in monthly installments.

162. Dr. Gelvin reviewed and signed off only on records for patients he himself referred to Kindred.

163. Dr. Gelvin submitted invoices to Kindred as a medical director for time he spent reviewing and signing off on his own patient records.

164. Dr. Gelvin rarely, if ever, visited the Kindred office in Sarasota to see patients or review records and only reviewed his own patient records in his own office.

165. Kindred knowingly paid Dr. Gelvin for medical director services in exchange for referrals.

166. Dr. Gelvin billed CMS for Care Plan Oversight.

167. Dr. Gelvin billed Kindred for medical director services for reviewing his own patient records and billed CMS for Plan of Care Oversight for the same patients.

168. Exhibit G shows email communication between Kindred and the Dr. Gelvin's staff regarding the amount of money Dr. Gelvin was being paid to review the medical records of his own patients. (Exhibit G).

169. Dr. Gelvin subsequently refused to sign orders until he was paid the agreed upon monthly amount.

170. Kindred and Dr. Gelvin had a financial relationship as defined by Stark.

171. Dr. Gelvin referred patients to Kindred.

172. The financial relationship between Kindred and Dr. Gelvin did not qualify for an exception to Stark's prohibition on referrals.

173. Kindred's relationship with Dr. Gelvin violated the Stark Law and the Anti-Kickback Statute.

### 3. **Paying Above FMV to Induce Referrals**

174. Kindred knowingly participated in a scheme to induce patient referrals by paying rental amounts above Fair Market Value.

175. Kindred leased office space at Woodlands Village Assisted Living Facility (ALF) for $550 per month.

176. Kindred knew the Fair Market Value (FMV) for the space at Woodlands ALF was in the range of $337.50-$393.75 per month. *See* FMV Appraisal at Exhibit H.

177.  Kindred leased office space from Woodlands ALF for a price above FMV. One of the purposes of this compensation was to induce referrals.

178.  At various points, as a result, Kindred received approximately 75% of the ALF's patients.

179.  Kindred requested a refund of money overpaid above the FMV when the ALF refused to continue the referral scheme.

180.  Kindred knowingly participated in this scheme to induce referrals.

181.  Patients referred to Kindred by the ALF included patients whose care was reimbursed through the Medicare program.

182.  Kindred and the ALF had a financial relationship as defined by Stark.

183.  The ALF referred patients to Kindred.

184.  The financial relationship between Kindred and the ALF did not qualify for an exception to Stark's prohibition on referrals.

185.  Kindred's relationship with the ALF violated the Stark Law and the Anti-Kickback Statute.

186.  Kindred utilized the same methods and means set forth in paragraphs 174- 185 above for other facilities over the period from 2012 through at least 2015.

### D.    Understaffing

187.  Kindred's marketing employees were specifically told not to decline referrals, even though Kindred did not have adequate staff to cover all of the patients referred.

188.  Patients did not receive proper care due to understaffing issues caused by these corporate pressures.

189.  It was common in Kindred's Fort Myers office for patients to have delayed care or missed visits due to lack of clinical staff to cover all patient referrals. Exhibit I shows an email from Relator Schwalbe discussing her concerns over admitting patients without adequate staffing as well as a report for one month of missed visits totaling 245 as a result of deliberate understaffing. (Exhibit I).

190.  Medicare requires that a registered nurse perform an initial assessment visit within 48 hours of receiving a referral, within 48 hours of the patient's return home, or on the physician-ordered start of care date.  42 C.F.R. § 484.55(a)(1).

191.  If a rehabilitation service such as speech therapy, physical therapy or occupational therapy is the only service ordered by the physician responsible for the plan of care, and the need for that service establishes Medicare eligibility, the initial assessment may also be made by the appropriate rehabilitation skilled professional. 42 C.F.R. § 484.55(a)(2).

192.  On August 14, 2015, Kindred received a referral for a patient, identified herein as "Patient Z," with a physician order for speech therapy and occupational therapy.

193.  Kindred was required to see Patient Z within 48 hours of receiving the referral.

194.  Kindred did not notify the referring physician until August 18, 2015 that Kindred would not be able to start care due to inadequate staffing.

195.  Patient Z was notified via answering machine on August 19, 2015, that start of care would not begin until the following week.

196.  Kindred did not have a speech therapist available to treat Patient Z until August 24, 2015.

197.  Kindred had no communication with Patient Z between August 14 and August 19, 2015.  *See* Client Coordination Notes Report for August 18, 2015 through August 25, 2015 at Exhibit J.

198.  Kindred did not comply with Medicare requirements for an initial home visit within 48 hours of receiving the referral for Patient Z.

199.  Patient Z did not receive proper care due to understaffing.

200.  Kindred utilized the same methods and means set forth in paragraphs 187- 199 above for other patients over the period from 2012 through at least 2015.

## VII.   RETALIATION

### A.   Retaliation Against Relator Donna Isabell

201.  Relator Isabell made several attempts on several different occasions to speak with Kindred's management in order to explain to management that many of Kindred's practices constituted fraud and that Relator Isabell would not be a part of it.

202.  Relator Isabell engaged in protected speech by saying that Kindred's practices— referenced above—throughout its many facilities violated the False Claims Act, as well as Medicare and Medicaid laws.

203.  Kindred paid Medical Directors to not only refer patients, but also for reviewing their own patient records after referring them to Kindred; Relator Isabell told Kindred on several occasions that she would not sign her name to any of the invoices for approval that were submitted for payment where fraud relating to reimbursing Medical Directors had occurred.

204.  Specifically, Relator Isabell made a complaint on June 22, 2015 to her supervisor

John Ellis (who was the Vice President of Operations in Southern Florida for Kindred at the time) regarding the Medical Director violations alleged in paragraphs 160- 175 above.

205.  On June 23, 2015, Relator Isabell gathered all invoices related to her Medical Director violations complaint and took them to Cindy Shook (who was the Division Director of Quality and Performance Improvement for Kindred at the time) and Anna Alvarez (who was the Regional Vice President of Clinical Compliance for Kindred at the time) at Kindred's Clearwater Corporate Office for their review.

206.  On June 23, 2015, after reviewing those invoices, Shook and Alvarez handed them back to Relator Isabell, who stated that she did not need them back unless she brought an FCA action. Shook and Alvarez told Relator Isabell to take the invoices.

207.  Relator Isabell complained about the FCA, Medicare, Medicaid, Kickback, and Stark Law violations up the chain of command, starting with direct supervisors.

208.  Relator Isabell complained about the FCA, Medicare, Medicaid, Kickback, and Stark Law violations specifically to John Ellis, Cindy Shook, Anna Alvarez, and Dr. Gelvin (who was the Medical Director for Kindred's Sarasota office at the time).

209.  Jason Owen (who was the President of the Southeast Region and John Ellis' boss at the time) ultimately terminated Relator Isabell. David Milton from Kindred's HR Department was also in the room at the time of Relator Isabell's termination.

210.  Kindred was aware of Realtor Isabell's protected conduct because Kindred was either directly contacted by Relator Isabell herself or by Relator Isabell's supervisors who relayed to Kindred Relator Isabell's protected conduct prior to her termination date.

211.  Relator Isabell told Kindred management on several occasions  that Kindred could

face civil or criminal penalties for the fraud of which Relator Isabell had been complaining.

212.  Relator Isabell specifically told John Ellis, Cindy Shook, and Anna Alvarez that Kindred could face civil or criminal penalties for the fraud of which Relator Isabell had been complaining.

213.  From their June 23, 2015 conversation, Shook and Alvarez were aware that Relator Isabell was likely to report the fraud beyond Kindred's internal reporting system and that Relator Isabell was likely to report the fraud to the government.

214.  From the June 23, 2015 conversation with Relator Isabell, Shook, and Alvarez, Kindred was aware that Relator Isabell was likely to report the fraud beyond Kindred's internal reporting system and that Relator Isabell was likely to report the fraud to the government.

215.  From Relator Isabell's complaints to Ellis, Shook, Alvarez, and other high-level management, Kindred was aware that Relator Isabell was likely to report the fraud beyond Kindred's internal reporting system and that Relator Isabell was likely to report the fraud to the government.

216.  Kindred was motivated to take adverse employment action(s) against Relator Isabell because of Relator Isabell's protected conduct.

217.  Kindred engaged in several adverse employment actions against Relator Isabell after Relator Isabell engaged in the protected conduct referenced above.

218.  Shortly after Relator Isabell told Kindred that she refused to contribute to the fraud,

Kindred retaliated against her and terminated her position with Kindred as of July 21, 2015.

219. On July 22, 2015, Kindred held a phone call with employees from at least fourteen (14) of Kindred's offices, including but not limited to: MJ Perez, Tammy Ciccone, Sandra Ramirez, Tracy Pijowanski, Amy Montgomery, Annette Honnila, Linda Moore, Joyce Pastore, Rochelle Hatcher, Kara Fales, Carol Dietzer, Susannah Chase, and Melissa Valencia.

220. During that July 22, 2015 phone call, Kindred stated the reason for Relator Isabell's termination was that she had engaged in illegal conduct, which is untrue.

221. Kindred further retaliated against Relator Isabell by holding that July 22, 2015 phone call.

222. In further retaliation against Relator Isabell, Kindred filed a breach of contract lawsuit against Relator Isabell in November 2015 in the Circuit Court for the Thirteenth Judicial Circuit in and for Hillsborough County, Florida, Case No. 15-CA-011380.

223. Kindred retaliated against Relator Isabell because Relator Isabell engaged in the protected conduct referenced above.

224. Relator Isabell was acting in furtherance of an FCA enforcement action or other efforts to stop violations of the FCA.

225. By virtue of the activities described above, Relator has engaged in conduct protected under the Federal False Claims Act and the Florida Medicaid False Claims Act.

226. Kindred knew that Relator Isabell was engaged in the protected conduct.

227. Kindred was aware of Relator Isabell's actions.

228. Kindred was motivated to take adverse employment actions against Relator Isabell because of the protected conduct.

229. Relator Isabell's actions in bringing the truth about the Kindred's fraud to her superiors' attention caused a hostile environment that led to retaliatory termination for Relator Isabell.

230. Kindred retaliated against Relator Isabell because Relator Isabell engaged in the protected conduct referenced above.

### B.      Retaliation Against Relator Schwalbe

231. Relator Schwalbe made several attempts on several different occasions to speak with Kindred's management in order to explain to management that many of Kindred's practices constituted fraud and that Relator Schwalbe would not be a part of it.

232. Relator Schwalbe engaged in protected speech by saying that Kindred's practices—referenced above—throughout its many facilities violated the False Claims Act, as well as Medicare and Medicaid laws.

233. Specifically, Relator Schwalbe made several complaints verbally and through email that patient care was suffering and would continue to decline if Kindred continued to bring on additional Medicare and Medicaid patients without appropriate resources to treat these additional patients, in violation of the FCA, as well as Medicare and Medicaid laws, from December 2014 up to September 2015.

234. Additionally, Relator Schwalbe expressed her concerns to management from

December 2014 to September 2015 regarding the lack of quality of care, missed visits, and lack of clinical staff to take care of existing patients at Kindred's facilities.

235. Relator Schwalbe complained about the FCA, Medicare, Medicaid, Kickback, and Stark Law violations up the chain of command, starting with her direct supervisors.

236. Relator Schwalbe complained about the FCA, Medicare, Medicaid, Kickback, and Stark Law violations to Dalla Johnson (who was an Area Director of Sales for Kindred at the time), Jason Curtchy (who was an Area Director of Sales for Kindred at the time), Kathleen Border (who was the Area Vice President of Sales for Kindred at the time), and John Ellis.

237. Relator Schwalbe was constructively discharged by Border, Ellis, Lisa Ramstack (who was the Regional Vice President of Sales in the Southeast for Kindred at the time), and Michael Gregory (who was a Divisional President for Florida for Kindred at the time).

238. Prior to Relator Schwalbe's termination, Border, Curtchy, Ellis, Ramstack, and Gregory were all copied on the above referenced emails from Relator Schwalbe regarding her complaints about Kindred's FCA, Medicare, Medicaid, Kickback, and Stark Law violations.

239. Kindred was aware of Realtor Schwalbe's protected conduct because Kindred was either directly contacted by Relator Schwalbe herself or by Relator Schwalbe's supervisors who relayed to Kindred Relator Schwalbe's protected conduct prior to her termination date.

240. Relator Schwalbe told Kindred management on several occasions  that Kindred could face civil or criminal penalties for the fraud of which Relator Schwalbe had been

complaining.

241. Relator Schwalbe specifically told Kathleen Border that Kindred could face civil or criminal penalties for the fraud of which Relator Schwalbe had been complaining.

242. Relator Schwalbe specifically told Border that Kindred could face civil or criminal penalties if Kindred continued to bring on additional Medicare and Medicaid patients through the Marketing Department that Kindred did not have the resources to see or treat.

243. From Relator Schwalbe's complaints to Border and other high-level management, Kindred was aware that Relator Schwalbe was likely to report the fraud beyond Kindred's internal reporting system and that Relator Schwalbe was likely to report the fraud to the government.

244. Kindred was motivated to take adverse employment action(s) against Relator Schwalbe because of Relator's protected conduct.

245. Kindred engaged in several adverse employment actions against Relator Schwalbe after Relator Schwalbe engaged in the protected conduct referenced above.

246. Relator Schwalbe complained on March 5, 2015, via email to Lisa Tuttle (who was the Branch Director at Fort Myers for Kindred at the time), Relator Isabell, Erin Bradley, Matt Harper and Kara Fales about the potential FCA, Medicare, and Medicaid violations referenced above.

247. Relator Schwalbe complained to Ellis, Border, Johnson, and Curtchy about the potential FCA, Medicare, and Medicaid violations referenced above, including to Ellis by email dated March 16, 2015.

248. On March 25, 2015, Curtchy met Relator Schwalbe at a Starbucks and asked that

she sign a noncompete agreement.

249.  The noncompete agreement stated that if Relator Schwalbe left Kindred, then Relator Schwalbe could not work for another Medicare home health agency for nine (9) months and included a bonus incentive to sign.

250.  Relator Schwalbe signed the noncompete agreement.

251.  At that time, Relator Schwalbe did not know that Kindred would take away her top two   accounts the very next month.

252.  In April 2015, Kindred took away Relator Schwalbe's top two accounts: Shell Point Retirement Community and the VA Clinic in Cape Coral.

253.  Those accounts were reassigned to Kara Fales, who at the time was a Patient Care Coordinator and was later promoted to a Territory Manager (a marketer that makes commission off of each Medicare admission).

254.  Shell Point and the VA made up roughly 70% of Relator Schwalbe's starts of care for   the majority of her years with Kindred. As a result of this decision, Relator Schwalbe estimated that she would lose about $45,000 in commissions from June 2015 through December 2015 and would likely be placed on a Performance Improvement Plan ("PIP").

255.  Relator Schwalbe emailed Lisa Ramstack and Michael Gregory on May 26, 2015, to express her concerns about her job security and never received a response.

256.  During the summer of 2015, Relator Schwalbe once again expressed her concerns about   her job security and potential FCA and Medicare and Medicaid violations, but this time to Johnson.

257.  On August 24, 2015, Relator Schwalbe received an email from Johnson stating that Relator Schwalbe's monthly productivity was at 66%, clearly a result of her concerns listed in the emails from the prior weeks.

258.  In that same email, Johnson stated that her low productivity number put Relator Schwalbe at risk of being put on a PIP in future months.

259.  Relator Schwalbe, still concerned about patient care and hiring additional clinicians to take care of patients, sent in her resignation letter on September 16, 2015, with her last day being September 18, 2015.

260.  Relator Schwalbe was asked to sign a noncompete agreement, had her top referral sources reassigned, and was told that she was subject to a PIP all within seven months. It was evident to Relator Schwalbe that Kindred wanted to terminate her employment and that she would be imminently terminated if she did not first resign.

261.  Within seven months after Relator Schwalbe told Kindred that she refused to contribute to the fraud, Kindred retaliated against Relator Schwalbe and constructively discharged her from her position with Kindred as of September 18, 2015.

262.  Kindred retaliated against Relator Schwalbe because Relator Schwalbe engaged in the protected conduct referenced above.

263.  Relator Schwalbe was acting in furtherance of an FCA enforcement action or other efforts to stop violations of the FCA.

264.  By virtue of the activities described above, Relator Schwalbe has engaged in conduct protected under the Federal False Claims Act and the Florida Medicaid False

Claims Act.

265. Kindred knew that Relator Schwalbe was engaged in the protected conduct.

266. Kindred was aware of Relator Schwalbe's actions.

267. Kindred was motivated to take adverse employment actions against Relator Schwalbe because of the protected conduct.

268. Relator Schwalbe's actions in bringing the truth about the Kindred's fraud to her superiors' attention caused a hostile environment that led to retaliatory constructive discharge for Relator Schwalbe.

269. Kindred retaliated against Relator Schwalbe because Relator Schwalbe engaged in the protected conduct referenced above.

## FIRST CAUSE OF ACTION
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1) and (a)(1)(A))

270. Relators restate and incorporate by reference paragraphs 1 through and including 200 above as if fully set forth herein.

271. Kindred knowingly presented or caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for payment for services rendered to patients that were not medically necessary and for services falsely inflated as the services were not in relation to the patient's medical needs as is required by law.

## SECOND CAUSE OF ACTION
(False Claims Act: Making and Using False Records and Statements
to Get False Claims Paid)
(31 U.S.C. § 3729(a)(1)(B) and (a)(2))

272. Relators restate and incorporate by reference paragraphs 1 through and including 200 above as if fully set forth herein.

273. Kindred knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims for payment or approval to the United States.

### THIRD CAUSE OF ACTION
(False Claims Act: Retaliation)
(31 U.S.C. § 3730(h))

274. Relator Isabell restates and incorporates by reference paragraphs 201 through and including 230 above as if fully set forth herein.

275. Relator Isabell's actions in bringing the truth about the Kindred's fraud to her superiors' attention caused a hostile environment that led to retaliatory termination for Relator Isabell.

276. Kindred retaliated against Relator Isabell because Relator Isabell engaged in the protected conduct referenced above.

### FOURTH CAUSE OF ACTION
(False Claims Act: Retaliation)
(31 U.S.C. § 3730(h))

277. Relator Schwalbe restates and incorporates by reference paragraphs 231 through and including 269 above as if fully set forth herein.

278. Relator Schwalbe's actions in bringing the truth about the Kindred's fraud to her superiors' attention caused a hostile environment that led to retaliatory constructive discharge for Relator Schwalbe.

279. Kindred retaliated against Relator Schwalbe because the Relator Schwalbe engaged in the protected conduct referenced above.

## PRAYER FOR RELIEF

WHEREFORE, Relators Isabell and Schwalbe request this Court enter judgment in favor of the United States against Defendants as follows:

On the First Count as to Defendants under the False Claims Act for three times the amount of damages sustained by the United States, and such civil penalties as are required by law, together with reasonable attorney fees and costs and all such further relief as may be just and proper.

On the Second Count as to Defendants under the False Claims Act for three times the amount of damages sustained by the United States, and such civil penalties as are required by law, together with reasonable attorney fees and costs and all such further relief as may be just and proper.

On the Third Count as to Defendants for retaliation against Relator Isabella for the amounts Kindred was unjustly enriched, plus interest, costs, and expenses, together with reasonable attorney fees and costs and all such further relief as may be just and proper.

On the Fourth Count as to Defendants for retaliation against Relator Schwalbe for the amounts Kindred was unjustly enriched, plus interest, costs, and expenses, together with reasonable attorney fees and costs and all such further relief as may be just and proper.

## JURY TRIAL DEMAND

Relators, on behalf of themselves and the United States of America, demand jury trial on all claims alleged herein.

Respectfully submitted,
The Law Offices of Stephen S. Stallings, Esq**.**

By:     _/s/ Stephen S. Stallings_
        Stephen S. Stallings, Esquire
        Fla. Bar No. 958859
        The Osterling Building
        228 Isabella Street
        Pittsburgh, PA 15212
        Tel.: (412) 322-7777
        Fax: (412) 322-7773
        attorney@stevestallingslaw.com
        _Counsel for Relators_